**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CUESTA PARTNERS LLC, | Case No.: 1:26-cv-03602(DLC)(RFT) |
| Plaintiff, | **AMENDED COMPLAINT** |
| -against- | |
| JAMIE REINGRUBER, LEO BERWICK LP, and LEO BERWICK AI, LP, | |
| Defendants. | |

Plaintiff, Cuesta Partners LLC ("Plaintiff" or "Cuesta"), by and through its undersigned attorneys, as and for its First Amended Complaint against Defendants Jamie Reingruber ("Reingruber"), Leo Berwick LP ("Leo Berwick"), Leo Berwick AI, LP ("LB AI") (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF THE ACTION

1. For nearly six years, Reingruber progressed up to Principal and Co-lead of Technology Strategy Practice at Cuesta. In that role, he reported directly to Cuesta's co-founding partners, oversaw responsibility for project completion for Cuesta's largest client accounts, and was deeply involved with all of them. In the last few years of his tenure, Reingruber was actively involved in the development and implementation of Cuesta's strategy and business development. For the year 2025, in exchange for acceptance of duties to maintain confidential information and certain post-employment non-solicit restrictions, Reingruber received over $300,000 in compensation.

2. However, and despite the position and access with which Cuesta entrusted him, in the final days of his employment, Reingruber orchestrated an extensive exfiltration of Cuesta's confidential information and trade secrets. Behind Reingruber's misconduct is his new employer,

LB AI and its corporate parent or affiliate, Leo Berwick, which induced Reingruber's breach and participated in his misappropriation of trade secrets and client information in order to shortcut building a competing business with Cuesta.

3.      After resigning from Cuesta, Reingruber refused to return the laptop issued to him by Cuesta during and for his employment and which contained copies of these files, despite proper demand and the requirements of his written employment agreement. It was not until injunctive relief was issued compelling him to do so that he complied with his obligation to return the laptop. Cuesta was shocked to learn that Reingruber had accessed, copied, and stolen numerous files containing some of Cuesta's most secret information, including highly confidential pricing agreements with its clients, client relationship maps, and its intellectual property, which had been developed over several years at great cost in time and money. Cuesta was also shocked to learn that Reingruber had disclosed Cuesta's highly confidential pricing agreements with its customers and pricing formulas and due diligence strategies to Leo Berwick and LB AI while still employed by Cuesta.

4.      The evidence uncovered to date of Defendants' scheme to destroy the competitive advantage enjoyed by Cuesta by maintaining this information as secret is astounding.

5.      Cuesta brings this action to stop the ongoing, irreparable harm caused by Defendants' wrongful retention of Cuesta's trade secrets and other confidential information, Reingruber's breaches of enforceable restrictive covenants, and Leo Berwick and LB AI's inducement of those breaches. But for this suit, and the injunctive relief that Cuesta seeks therein, Defendants' misconduct threatens to devastate Cuesta's relationship with its clients, the loss of its senior level employees, and cost it unascertainable damages, and expose it to liability arising from its own contractual obligations to its clients and business partners.

6.      As of this filing, Defendants are still in possession of Cuesta's confidential information, and the risk of irreparable harm from their unfair competition remains unabated. Absent appropriate judicial intervention, Defendants will continue to build a business at LB AI through the unlawful retention and use of the confidential information and trade secrets that Cuesta spent significant resources developing over the past several years.

## PARTIES

7.      Cuesta is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Illinois.

8.      Jamie Reingruber is an individual residing within the State of New York.

9.      Leo Berwick is a limited partnership organized and existing under the laws of the State of Delaware, with a principal place of business in New York.

10.     Leo Berwick holds itself out as a mergers and acquisition advisory firm.

11.     Leo Berwick recently launched LB AI, an entity which provides services to Leo Berwick. LB AI is a direct competitor with Cuesta, provides identical services and targets the same industries.

12.     LB AI is a limited partnership organized and existing under the laws of the State of Delaware, with a place of business in Toronto, Canada.

## JURISDICTION AND VENUE

13.     This Court has federal question subject matter jurisdiction over the pending matter pursuant to 28 U.S.C. §1331 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1337.

14.     Venue is properly laid in this Court pursuant to 28 U.S.C. §1391(b)(1) because Defendant Reingruber resides in this District.

## FACTUAL ALLEGATIONS

### *Reingruber's Terms of Employment With Cuesta*

15.     Cuesta is a data, artificial intelligence and information technology diligence firm. Cuesta works with private equity and corporate clients on data strategy and advanced analytics, AI strategy and execution, M&A advisory and technology due diligence, technology strategy and delivery, and transformation support.

16.     Reingruber began employment with Cuesta in 2020 as one of its first employees and rose to the level of Principal and Co-lead of Technology Strategy Practice.

17.     Cuesta issued Reingruber a device to use exclusively for work related to his employment with Cuesta. This included a MacBookPro laptop, which was issued to Reingruber during his employment and for use during his employment (the "Company laptop").

18.     To safeguard its confidential and trade secret information from being used for any unauthorized purpose – and to protect its substantial investment in its employees – Cuesta requires its employees to agree to confidentiality, non-disclosure, and non-solicitation restrictions.

19.     As a condition of his employment by Cuesta, Reingruber executed the Employee Confidentiality, Non-Compete and Non-Solicitation Agreement (the "Agreement") and signed the Agreement with an effective date of August 6, 2021.

20.     In Paragraph 1.2 of the Agreement, Reingruber agreed that:

> [He will] during and after the term of this Agreement (i) hold in confidence for the benefit of the Company and to not disclose, use, copy, reproduce, publish, summarize, make available to any third party, or remove from the premises of the Company (collectively, "Disclosure") any Confidential Information, in any form, without the prior written consent of the Company; (ii) take all reasonable measures to prevent such Disclosure or misuse of the Confidential Information; (iii) not use the Confidential Information, except in the performance of a employment with the Company or any of its Affiliates.

Upon request of the Company at any time during the term of this Agreement, or upon termination of this Agreement for any reason, including expiration of the term, [Mr. Reingruber] agrees to cease using and to return to the Company all whole and partial copies and derivatives of the Confidential Information in [his] possession or under [his] direct or indirect control, whether complete or in progress.

21.    Confidential Information is defined in Section 1.1 of the Agreement to include:

lists of names or classes of customers or personnel, lists of and information related to directors, officers, employees, consultants, contractors, business partners, suppliers or manufacturing entities, inventions, innovations, improvements, research or development activities and plans, test results, product and prototype specifications, disclosures, processes, systems, methods, formulae, devices, patents, patent applications, trademarks, intellectual property, instruments, materials, products, patterns, compilations, programs, techniques, sequences, designs, specifications, computer programs, source codes, software and hardware architecture and "road maps," mask works, costs of production, volume of sales, promotional methods, marketing plans, business plans, business opportunities, strategies, forecasts, prices or other financial data, financial statements, budgets, projections, representative agreements, licenses, sub-licenses, agreements, and any and all reports, summaries and other findings concerning sales, marketing, development and operational techniques (including the teaching thereof), marketing and purchasing formulae, development of product designs, pre-manufacturing product designs, formats, financial data, trade secrets, proprietary and confidential information about Company or Affiliate investments and business partners or affiliates, business plans or strategies, and any and all other confidential or proprietary information and data belonging to or relating to the affairs of the Company and its Affiliates that should reasonably have been understood to be proprietary and confidential, either because of legends or other markings, the circumstances of disclosure or the nature of the information or data, itself, and whether disclosed directly or indirectly, or orally, visually or in writing. Confidential Information includes not only information that has been disclosed to Employee or to which Employee had access in the course of employment, but also information that Employee developed or learned during the course of employment with the Company.

22.    In Section 6 of the Agreement, Mr. Reingruber agreed to a non-solicitation provision, which states the following:

5

> During [his] employment with the Company and for a period of twelve (12) months after the termination of [his] employment with the Company for any reason, [he] will not, without the express, prior written consent of the Company, whether personally or through others, directly or indirectly: (a) disrupt, damage, impair or interfere with the business of the Company by soliciting any employee, consultant, officer or director of the Company or any of its subsidiaries for employment, consulting or other services elsewhere...

23.     Mr. Reingruber also agreed to a return-of-property provision in Section 8 of the Agreement that provides:

> Upon termination of Employee's employment with the Company for any reason, Employee shall return to the Company all Company property including originals and copies of Company-issued keys, computers, devices, business documents correspondence, computer software, printouts, advertisements, brochures, equipment, manuals, notebooks, and any other tangible property, Confidential Information and other records and documents relating to the Company and its business, and shall not procure, photocopy or copy any such Company property after notification of, or in anticipation of, termination of employment.

24.     In Section 5 of the Agreement, Reingruber agreed as follows:

> Employee agrees that for a period of six months (6) months following termination of his or her employment from the Company, Employee will not, whether personally or through others, directly or indirectly, acting as an employee, contractor, consultant, partner, shareholder or otherwise, render to or for any Client any services of the type rendered by the Company.

25.     The Agreement provides that the term of restrictions contained therein shall be tolled during litigation after preliminary finding of a breach.

### *Reingruber's Senior Role at Cuesta and Access to Its Confidential Files*

26.     As Principal and Co-lead of Technology Strategy Practice, Reingruber was responsible for the full cycle of projects up through and including closing and interim deliverables.

27.     By virtue of his seniority within Cuesta, Reingruber had access to, and regularly worked with, nearly all of Cuesta's competitively sensitive confidential information and trade

secrets. He was deeply involved with the creation and development of Cuesta's templates for its deliverables, which contained nuanced formulas and algorithms curated and developed over many years.  These templates constitute Cuesta's trade secrets and were built in tandem with the Company's founding and carefully developed with the help of Cuesta's AI specialists, data engineers, data analysts, and consultants. These documents, including Form Factor documents, propel Cuesta's due diligence, enable AI value backlog by an inventory and uses of cases with excel sheets containing their developed formulas and dimensions to evaluate an AI opportunity, and inform technology strategies by past cast studies and examples.

28.    If a competitor were to obtain access to these documents, it would have access to Cuesta's intellectual property and a blueprint of Cuesta's methodology, its process for its work product, and direct access to how Cuesta structures its meeting agendas, work plans, direct insight as to how it produces its tables and visuals efficiently to translate findings to its clients. This comprises Cuesta's robust methodology and would save a competitor such as LB AI significant time and money in having to develop its own product.

29.    Reingruber also had access to all of Cuesta's most critical corporate trade secrets, including customer-specific proposal and pricing information, financial and other business information associated with clients and prospective clients, and detailed business relationship and development strategy.

30.    The relationships between Cuesta and its clients are a significant source of Cuesta's competitive advantage in the marketplace. Over the past six years, Cuesta has invested a substantial amount of time and money in developing its relationships with its clients and maintaining trade secrets and other confidential and proprietary information relating to its business relationships with the customers. Such trade secret and confidential business information includes,

7

without limitation, Cuesta's client files. These contained extensive confidential information, including each client's due diligence files and Cuesta's work product procured for the respective client. Among these files and documents were client relationship maps, developed by Cuesta, with key information on each client's leadership and planned strategy and deliverables, sales strategies, and native files with Cuesta's IP to streamline work demands.

31.    Cuesta develops a pricing schedule for each client and prospective client, information which is maintained in the client files. Each of Cuesta's customized pricing schedule reflects a significant investment by Cuesta in cultivating its customer relationships, negotiating favorable terms, compiling highly sensitive information regarding the customers' needs and preferences, and developing competitive pricing strategies.

32.    Cuesta's pricing schedules are highly proprietary because they serve as the financial backbone of how Cuesta monetizes its services. Pricing schedules serve as key reference documents for billing, quoting, and contract negotiations between Cuesta and its customers, because price is one of the primary drivers in a company's selection of an AI firm such as Cuesta. This is so because the cost of delivery directly impacts the company's own profitability margins in the underlying transaction.

33.    If a Cuesta competitor had access to Cuesta's pricing schedule, and the highly-detailed, customer-specific pricing information reflected therein, it would enable that competitor to undercut Cuesta's prices, target Cuesta's most profitable customers, and otherwise strategically exploit Cuesta's pricing model (including profit margins, cost structures, and discount strategies) for its own advantage. Importantly, Cuesta's pricing schedules contain a level of detail that make them impossible to reconstruct based on memory alone. Each pricing schedule contains a myriad of different factors that incrementally change based on variables.

8

34. In addition, as part of his responsibilities to oversee client projects, Reingruber routinely worked with client files.

35. Reingruber also had access to Cuesta's Salesforce database which contained the company's client lists and contact information.

36. For 2025, Reingruber's total compensation consisted of salary in the amount of $225,000 and a bonus of $64,174.

37. In addition to his compensation, Cuesta and Reingruber entered into a transaction bonus agreement dated January 30, 2025 (the "Transaction Bonus Agreement"), wherein Reingruber would be entitled to a bonus of in the event of (i) a sale of all or substantially all the assets or ownership interests of Cuesta or (ii) a recapitalization of the Cuesta (in either case, a "Transaction").

38. Reingruber was eligible for a transaction bonus ("Transaction Bonus") from the Company upon the closing of a Transaction based on the Company's gross sales price minus transaction expenses as defined therein.

39. As a condition precedent, payment of the Transaction Bonus was subject to (a) Reingruber being employed in good standing by Cuesta from the Effective Date through the closing of the Transaction; and (b) Reingruber complying with the terms and provisions of Transaction Bonus Agreement.

40. Section 3 of the Transaction Bonus Agreement specifies that "if [the] conditions [precedent] are not satisfied, [Reingruber] shall not be entitled to a Transaction Bonus."

41. The Terms of the Transaction Bonus Agreement and the amount of the Transaction Bonus to be paid to Reingruber were confidential and not disclosed to the public or individuals not

9

parties to the agreement. Thus, in order to maintain confidentiality, Section 4 of the Transaction Bonus Agreement states that:

> Confidentiality. This Agreement, the Transaction Bonus and the terms thereof are confidential to the parties. Except as and to the extent required by law, each party will not disclose the existence of this Agreement or the Transaction Bonus, or the terms thereof, to any other party other than such party's representatives and will advise such representatives not to disclose any such matters other than in connection with this Agreement and the payment of a Transaction Bonus. Employee shall be liable for any breach of this provision by Employee's representatives.

### *Cuesta's Efforts to Protect Their Trade Secrets and Confidential Information*

42.     Cuesta has invested considerable time, expense, and resources in its business and employees, including Reingruber during his employment, so that its employees can perform their work for Cuesta competently and successfully.

43.     Cuesta maintains trade secrets that are valuable, confidential, and proprietary to Cuesta, and that are not generally known in the public domain.

44.     Through their work, Cuesta employees, including Reingruber, gain detailed and intimate knowledge of Cuesta's trade secrets and other confidential information.

45.     Cuesta's trade secrets, confidential information, and business relationships have significant economic value to it. Cuesta has a legitimate business interest in keeping such information confidential and not allowing these trade secrets and other confidential information to be disclosed to its competitors through any improper means.

46.     Cuesta's trade secrets and confidential information would be of significant economic value to its competitors.

47.     Consequently, Cuesta takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure. At all relevant

times, Cuesta has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information, including:

    a. requiring that all employees agree to confidentiality and non-disclosure provisions, such as those in Reingruber's Agreement.

    b. maintaining customer and personnel information on password-protected computer systems accessible only by employees of Plaintiff or its affiliates.

    c. Requiring that all client files be stored on Microsoft Sharepoint and not locally.

    d. Maintaining Microsoft Intune on all company laptops enabling the company to lock laptops remotely.

    e. Providing access to client, personnel, and sales data on an individual need-to-know basis.

    f. Transmitting PDF files to non-Cuesta employees, including clients, to preserve key formulas and IP embedded in native files.

### *Leo Berwick Plans to Launch Leo Berwick AI and Recruits Reingruber*

48. Upon information and belief, Leo Berwick has attempted, and failed, to acquire businesses that perform the very services Cuesta does.

49. In or about September 2025, it approached Cuesta about acquiring Cuesta, an overture that Cuesta rejected.

50. Upon information and belief, in lieu of continuing its efforts to acquire such a business, and having been turned away by Cuesta, Leo Berwick decided to launch its own entity, LB AI.

51. LB AI was incorporated as "Tenen Point LP" in late 2025, and on or about February 6, 2026, formally changed its name to Leo Berwick AI.

52.     LB AI plans to replicate Cuesta's business model and solicit its employees, including Reingruber, in order to launch operations in direct competition with Cuesta with the advantage of having access to and using Cuesta's confidential information.

53.     In furtherance of this goal, Defendants solicited Cuesta employees, including Reingruber and at least one other Principal, to join LB AI. This group lift-out would leave Cuesta understaffed and threaten its business through a major territorial market.

54.     As part of these efforts, Leo Berwick and/or LB AI began recruiting Reingruber for LB AI as early as December 2025. Upon information and belief, Leo Berwick predicated its offer to Reingruber on his launching or significantly contributing to its operations, which would be executed in part by use of Cuesta's confidential information.

### Defendants Conspire To Breach Reingruber's Agreement with Cuesta and Steal Its Clients, Employees, and Confidential Information

55.     As early as December 2025, Defendants initiated their efforts to launch a competing business with Cuesta.

56.     In December 2025, Leo Berwick's CEO, Nick Kato, together with other representatives of Leo Berwick and/or LB AI, and Reingruber discussed Leo Berwick's plans to launch a competing business with Cuesta. Kato informed Reingruber that Leo Berwick and LB AI targeted him as a recruit. Kato stated that "when we found your profile, what we liked about it was, you're in the you know, you you know, obviously, are in New York. You seem like you're like, part of the private equity team doing a lot of, doing a lot of that type of work, you know, the diligence and the kind of implementation post close, and that's a space that we're very interested in."

12

57.     Kato further stated to Reingruber that after his unsuccessful discussions about a transaction with Cuesta or an acquisition of the company, he developed a plan to steal its key people and develop a competing business. Katos stated to Reingruber:

> I was like, and then, and then, when you look at, like, the number of principals at your level that are around, and like, who's doing what? Like, they kind of did some work. And were like, it seems like you this guy, like, running Columbia is important, you know, and maybe like four other people kind of important. Seemed like, there's like six people that are, like, really important, you know, at Cuesta that don't have equity. And we're like, this seems like a great opportunity to go to these people. Give them large shining bonuses, give them nice guarantees, yeah, have a bunch of capital to go and start the business and make it a thing and then give everyone equity in the business, you know? And so that's what kind of prompted it.

58.     During this phone call, Reingruber explicitly disclosed to Kato that he was expecting to receive the Transaction Bonus to Kato, including the approximate amount of the anticipated bonus payment.

59.     Kato next set up a meeting, where he introduced Reingruber to Leo Berwick and Leo Berwick AI personnel, including LB AI's Chief Executive Officer, Omar Khalifa.

60.     During a phone call with Kato, Khalifa and Reingruber, Kato and Khalifa initiated their plans to steal Cuesta's employees and clients and induce Reingruber to do so.  Kato or Khalifa stated to Reingruber:

> So, yeah, Jamie, something that we, obviously, we could talk about in a future discussion, if we can get you on board with this, it'd be critical for you to help us identify other members of your team that need to come along and be part of this. Because, in my mind, this works if there's like, 565[sic] to 10 people that are, you know, that core to be lifted out….

61.     Over the next several months, Kato, Khalifa and Reingruber had several phone calls with Reingruber in furtherance of their plan to launch a competing business and induce Reingruber's breach of his Agreement with Cuesta.

62. In one meeting, while still employed with Cuesta, Reingruber specified and disclosed to Defendants Cuesta's go-to-market strategy around how Cuesta sells and delivers due diligence.

63. Defendants negotiated the term of Reingruber's employment throughout early 2026 and continued to plot.

64. Reingruber disclosed to Khalifa and Kato Cuesta's staffing model and strategy for due diligence and data work, laying out the details of Cuesta's go-to-market strategy, developed methods for pricing, including Cuesta's formula for pricing an initial AI value backlog and bet on the following execution work. Kato and Khalifa engaged in a series of questions with Reingruber, wherein he disclosed staffing, percentage roles, and pricing. He walked them through several of Cuesta's ongoing projects, relaying key information as to pricing and delivery strategies that would help LB AI accelerate its business.

65. Kato and Reingruber detailed their plans to solicit Colum Elliot-Kelly, Cuesta's Principal, Reingruber advising Kato that: "he's built, like, tons of AI products, and so, like, he's critical for a lot of the solutioning in the back end."

66. In February 2026, Leo Berwick or LB AI conveyed to Reingruber a formal offer of employment.

67. Reingruber executed a restrictive covenant agreement with Leo Berwick and LB AI on February 12, 2026.

68. On February 13, 2026, Reingruber emailed Parisa Fallahi with the subject line "Final Comparison," outlining the offer received from "Leo Berwick." In the e-mail, he disclosed that he would be getting a "$1M Transaction Bonus, 50% to be paid out immediately, and 50% 12 months later."

14

69.    On February 25, 2026, Reingruber emailed Khalifa and Peter Robinson, Special Advisor, Integration & Separation at LB AI, setting forth details as to LB AI's planned marketing strategy and client pitches. Reingruber wrote:

> I'm already seeing this firsthand: 100% of the warm intros we've had from our buyer to other PE clients thus far have been prompted by a request from an MD to "talk about AI." PE investment and operating teams are rushing to weave AI into their investment and value creation strategies. This presents a unique opportunity to pitch our services while providing genuinely helpful advice, particularly around which specific AI use cases we've seen be most effective for companies that resemble their portfolio companies. Discussions on how to approach triaging and executing these initiatives across the portfolio also always seem to drive an unusually high level of engagement.

70.    In a follow-up email on February 27, 2026, Reingruber stated he looked "forward to connecting tomorrow," with additional suggestions to LB AI's business plan, suggesting that they establish a Customer Advisory Board in order to create "a strong opportunity to bring in a few trusted relationships who can provide ongoing feedback while becoming genuinely invested in our success. I think forming both a PE-focused CAB and an industry-specific CAB would make a lot of sense."

71.    On February 28, 2026, Reingruber wrote to Robinson and Khalifa: "[t]o be confirmed Monday, but it looks like I'll receive my Transaction Bonus March 13 or 20, after which I'll schedule some time with Cuesta leadership to discuss my exit… We didn't directly discuss this but it would also be helpful if there were broader language providing legal protection against potential litigation from Cuesta under my agreement. For example, if they were to allege a non-solicitation breach in connection with someone independently choosing to join, I would want confirmation that my legal defense would be covered."

72.    Khalifa responded, "all the blow [sic] sounds good and will chat with lawyers and revert back."

73.     In early March 2026, Reingruber traveled with Cuesta personnel to Toronto, Canada for business purposes. He remained in Toronto for an extra day to meet with Leo Berwick and LB AI.

74.     Reingruber prepared a "Leo Berwick IT Advisory year 1 Business Development Plan" dated March 2026, wherein he explicitly stated that he would target private equity funds not yet Leo Berwick clients, through Reingruber's existing "**PE network built across Cuesta Partners**, Riveron, and prior advisory work. Key targets include funds with active deal pipelines where IT risk is a known concern." (emphasis added).

75.     Reingruber developed pitch decks for Leo Berwick and LB AI as early as March 5, 2026, setting forth plans to target "private equity clients" – the very clients that Cuesta serviced or sought to service.

76.     In furtherance of this goal, Reingruber created a LinkedIn Connection Analysis, listing "potential clients – PE Firms, Capital Providers & Adjacent" which specifically included Cuesta's clients. On the document, he even noted "pass to LB!" next to one individual. The excel file also included a sheet entitled "Contractors & Industry SMEs – Tenon Point AI & Data Practice" which listed Cuesta's current contractors, and one that Leo Berwick AI actually hired while working for Cuesta.

77.     On March 6, 2026, Leo Berwick and LB AI submitted a final offer package to Reingruber.

78.     Included in his proposed employment contract with LB AI was an explicit provision to incentivize Reingruber to solicit employees to Cuesta. Reingruber's employment agreement with LB AI contained a special bonus provision under which Reingruber would be compensated with bonuses for the hiring of individuals with the following titles: (i) Offshore leader: $125,000;

16

(ii) AI SME (subject-matter expert) $125,000; (iii) Associate $40,000; (iv) Consultant $50,000; and (v) Manager $60,000.

79.     Reingruber's employment contract with Leo Berwick AI also contained an indemnity provision including all claims, costs expenses, including reasonable attorneys' fees arising out of relating to any actual or threatened claim by Cuesta against Reingruber "based upon or arising from [Reingruber's] contacting, soliciting, communicating with, providing services to (a) employees or former employees of [Cuesta], and (b) clients or former clients of [Cuesta] with whom [Reingruber] had a pre-existing professional relationship or whom [Reingruber] personally serviced during his employment with [Cuesta]."

### *Reingruber has to date failed and refused to return the Company laptop.*
### *Reingruber's Unsanctioned and Massive Downloading of Cuesta's Files.*

80.     In anticipation of his departure to Cuesta's competitor, Reingruber began downloading a magnitude of Cuesta's confidential information and trade secrets the very next day.

81.     The number of downloads performed was exponentially higher than Reingruber had performed previously or that of other Principals of Cuesta.  Between November 6, 2025 and February 2026, Reingruber had downloaded approximately 1,314 files to his laptop.

82.     By contrast, on just one day, March 8, 2026, Reingruber downloaded 24,000 files. Over the weekend of March 7-8, 2026, Reingruber downloaded slightly more than 34,500 files, a level of activity which was completely inconsistent with his legitimate job needs.

83.     Among the total of approximately 40,562 files that he downloaded between March 2 and March 19, 2026, Reingruber planned to and did in fact steal nearly *all of Cuesta's complete client files*.

84.     By way of example only, Reingruber downloaded multiple files regarding clients for which he had never worked or clients for which he was not currently engaged on any projects.

17

85.     The materials that Reingruber downloaded included, among other things, clients' financial statements, bank statements, payroll registers, tax returns, employment agreements, incentive and commission plans, employee reviews, video recordings, non-compete and non-disclosure agreements and corporation formation documents.  Much of this material was provided to Cuesta by its clients in connection with specific projects including due diligence matters, evidencing that Reingruber's downloading constituted a generalized "sweep" of files and records.

86.     In addition, the documents contained native file templates for Cuesta's deliverables, with embedded formulas that Cuesta developed over several years. This data is especially valuable as it provides a short cut to outputs in work product. Some examples of these include (1) a native power point document entitled "Data Platform MDM Timesavers," that is comprised of over 75 slides of example roadmaps, business cases views, ways to document Cuesta's recommendations and proposals, which allows Cuesta to save substantial time and money, and deliver consistent, high quality deliverables and leverage junior employees to compete work from the document templates rather than senior level executives repeatedly building projects from scratch for each and every client; (2) a Meyers AI Value Backlog document, that is an actual client deliverable, containing all of the AI value backlog details, setting forth Cuesta's methodology as to the resolution of backlog work, pricing estimates for Cuesta to complete its work, and its plans to build an AI strategy at an organization; and (3) Form Factor documents.

87.     The files also included documents created by Cuesta, such as client relationship maps detailing each client's leadership and decision makers, with planned strategies for securing contracts and pricing schedules.

88.     The due diligence files and privileged client information provide insight into customers' individual price tolerance.

89. The sensitive and confidential data comprising the client files constitutes stolen by Reingruber constitutes Cuesta's trade secret material. The data was compiled through great effort over time and derives value from its secrecy and was entrusted to Cuesta by its clients with an expectation of privacy and confidentiality. Were a competitor like Leo Berwick AI to take possession of this data, it could be used by that competitor to severely undercut Cuesta in the marketplace.

90. Moreover, the inclusion of client relationship maps among the files stolen by Reingruber suggests that Defendants intend to use that information to solicit Cuesta's customers.

91. On information and belief, Reingruber plans to utilize these files to launch LB AI's operations quickly and without spending the time, effort or financial resources to develop its own materials in the normal course and to engage in improper competition with Cuesta.

92. The circumstances of this case presents the very dangers that the Agreement's covenants and the Defend Trade Secrets Act ("DTSA") are intended to protect against. Armed with Cuesta's detailed, up-to-date, intellectual property formulas and client data, Reingruber will be able to assist LB AI in undercutting Cuesta's strategic initiatives in the market – beating it to the punch at millions of dollars in cost savings. LB AI's targeted hires of Cuesta's veterans heightens these synergies, to Cuesta's irreparable detriment.

93. Immediately upon discovering Reingruber's downloading conduct, Cuesta remotely locked the Company laptop. However, in conjunction with his downloading, Reingruber saved all of the same documents on his iCloud accounts, permitting access to them through any of his personal devices, all without Cuesta's consent. Moreover, Reingruber purchased two external hard drives in March 2026, just days prior to his plotted theft of Cuesta's records, and exfiltrated all of the same documents on the external hard drives.

19

94.    Reingruber also downloaded Cuesta's contact list, including the names of all of its clients and their contact information including email addresses.

95.    This was clearly done for the purpose of using them in connection with his new position with Leo Berwick and LB AI to unfairly compete with Cuesta and solicit its clients.

96.    Reingruber disclosed to Cuesta on March 13, 2026 that he was considering leaving, advised Cuesta on March 17, 2026 that he was considering joining Leo Berwick, and conveyed his resignation to Cuesta on March 18, 2026.

97.    On Reingruber's last day of employment, March 19, 2026, Cuesta provided Reingruber with a prepaid FedEx label with directions to return his Company laptop. Reingruber ignored this request.

### After Reingruber's Departure, Defendants Begin Soliciting Cuesta's Employees

98.    Upon information and belief, Defendants have solicited employees at Cuesta and have tendered offers of employment to an unknown number of its employees.

99.    At least one senior data resource who performed work for Cuesta in the past several months is currently employed at LB AI as a Data Integration Specialist. This followed after Reingruber solicited terms of hiring information from a different Cuesta Senior Manager. LB AI also conveyed an offer to another one of Cuesta's Principals.

### Cuesta Puts Defendants on Notice of Its Claims

100.    On March 24, 2026, counsel for Cuesta sent Reingruber and Leo Berwick a letter placing it on notice of the terms of Reingruber's Agreement, asking that Reingruber comply with his obligations thereunder, and that Leo Berwick and LB AI not tortiously interfere with Cuesta's contractual rights. Cuesta also requested assurances related to Reingruber's downloading of Cuesta's confidential information and solicitation of employees to Leo Berwick or LB AI.

20

101.    On March 24, 2026, counsel for Leo Berwick responded by letter to Cuesta's counsel, advising that Reingruber was planned to start at LB AI, an entity which provides services to Leo Berwick, falsely claiming that Reingruber's new position does not overlap with the nature of work that Cuesta does. More importantly, Leo Berwick did not address the assurances Cuesta sought. Notably, Leo Berwick did not deny that Reingruber solicited Cuesta's employees to Leo Berwick and LB AI, disclosed and transmitted Cuesta's confidential information to them, or that they had an involvement in inducing him to do so.

102.    The stolen data regarding Cuesta could be used for the benefit of Leo Berwick and LB AI- and to Cuesta's detriment - regardless which entity actually employs Reingruber.

103.    On March 25, 2026, counsel for Reingruber responded by letter to Cuesta's counsel, in part, denying enforceability of Reingruber's Agreement, but did not contest the non-solicitation, confidentiality obligations, nor the return of property provision.

104.    In acknowledging Reingruber's downloading Cuesta's confidential files in the days leading to his employment, Reingruber's counsel asserted that "there was nothing nefarious about an employee downloading files he needs to perform his job." Reingruber was silent on whether the confidential information he improperly downloaded was disseminated to Leo Berwick or LB AI.

105.    Additionally, counsel stated that Reingruber is "willing" to return the Company laptop only *after* the laptop was unlocked and Reingruber able to remove his personal information.

106.    On April 4, 2026, counsel responded to Defendants and restated their prior assurances related to Reingruber and Leo Berwick. Cuesta again requested that Reingruber's Company laptop be returned as required by his contract and advised that it would work in

conjunction with Reingruber to ensure all of his personal files were removed from the Company laptop upon receipt.

107.   Reingruber refused to return the Company laptop.

108.   Plaintiff commenced this action on April 30, 2026, and obtained a Temporary Restraining Order (*see* Docket No. 19) (the "TRO").  Cuesta submits that Defendants' actions have only temporarily halted due to the Court's issuance of the TRO and absent injunctive relief, their unlawful conduct would continue.

109.   Moreover, while Reingruber returned the Company laptop in accordance with the TRO, together with an external hard drive which contained over 40,000 Cuesta files, Cuesta's trade secrets and confidential information remain available on, as best can be determined at present, his two external hard drives and through his iCloud account.

110.   Reingruber's employment with LB AI makes it inevitable that he will continue to misuse and misappropriate Cuesta's trade secrets and other confidential information to unfairly compete against Cuesta.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract – Against Reingruber)

111.   Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

112.   Under Section 1.2 of the Agreement, Reingruber was obligated to hold Cuesta's confidential information in confidence for the benefit of Cuesta and to not disclose or use the confidential information for any other purpose or entity.

113.   Reingruber breached Section 1.2 of the Agreement by, at minimum, downloading approximately 46,000 of Cuesta's files, including complete client files, in anticipation of his

22

departure from Cuesta, and transferring them onto his external hard drives and to his iCloud account.

114.   Under Section 5 of the Agreement, Reingruber agreed that for a period of six (6) months, he would not render to or for any Cuesta Client, as defined therein, any services of the type rendered by the Company.

115.   Under Section 6 of the Agreement, Reingruber agreed that for a period of twelve (12) months after the termination of his employment, he would not solicit Cuesta's customers.

116.   Under Section 6 of the Agreement, Reingruber agreed that for a period of twelve (12) months after the termination of his employment, that he would not solicit Cuesta's employees.

117.   Upon information and belief, Reingruber has, at a minimum, breached Section 6 of the Agreement by soliciting other principals at Cuesta to Leo Berwick and LB AI.

118.   Upon information and belief, Reingruber has, at a minimum, breached Sections 5 and 6 of the Agreement by soliciting Cuesta customers to Leo Berwick and LB AI and rendering services the services that Cuesta rendered to them.

119.   Cuesta has a legitimate business interest in enforcing the non-solicitation and non-competition provisions of the Agreement because, inter alia, Reingruber possesses confidential information regarding Plaintiff's business - including Plaintiff's client contact information and pricing strategy - that Defendants can use to undermine Plaintiff's business strategy and customer relationships. Plaintiff also has a legitimate business interest in protecting its customer and brand goodwill, which will suffer harm as a result of Reingruber's breach of Sections 1.1, 1.2, and 6 of the Agreement.

120.   The enforcement sought by Plaintiff does not pose an undue hardship on Reingruber.

23

121.    Under Section 8 of the Agreement, Reingruber agreed to return all Cuesta property in his possession after notification of, or in anticipation of, termination of employment.

122.    Reingruber breached Section 8 by failing to return, upon request or upon the conclusion of his employment, the Company-issued laptop, onto which he had saved Plaintiff's confidential information, or the over 40,000 files that he downloaded from Cuesta's Microsoft Sharepoint and exfiltrating them to his iCloud an external hard drives.

123.    Cuesta has fully performed its obligations under the Agreement.

124.    As a direct and proximate result of Reingruber's breach of Sections 1.1, 1.2, 6, and 8 of the Agreement, Cuesta has suffered and will continue to suffer irreparable harm, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

125.    Cuesta will continue to suffer this harm as a direct and proximate result of Reingruber's misconduct, unless and until Reingruber is restrained from his conduct by preliminary and permanent injunctive relief, and compelled to abide by Sections 1.1, 1.2, 6, and 8 of the Agreement.

126.    As a direct and proximate result of Reingruber's breach of the Agreement, Plaintiff has suffered and will continue to suffer additional damages, which will continue to accrue in the form of lost business and other damages in an amount to be proved at trial.

127.    By breach of his contractual obligations to Cuesta, as set forth above, Reingruber has forfeited his entitlement to post-employment payments which had been owed to him pursuant to a Transaction Bonus Agreement.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Tortious Interference with Contract – Against Leo Berwick and LB AI)**

128.    Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

129. The Agreement signed by Reingruber is valid and enforceable.

130. Upon information and belief, Leo Berwickis a direct or indirect owner of LB and fully aware of and a participant in its hiring of Reingruber and his actions in connection with the records of Cuesta.

131. At or shortly after the time that Leo Berwick and/or LB AI hired Reingruber, Leo Berwick and LB AI were aware or were made aware that Reingruber had executed the Agreement, Defendants negotiated indemnity for litigation against Reingruber in connection with his breaches of the Agreement and thus became aware of the terms of the Agreement.

132. On March 25, 2026, Plaintiff provided Leo Berwick and LB AI with direct notice of the terms of the Agreement.

133. Upon information and belief, Leo Berwick and LB AI intentionally induced Reingruber to violate Section 5 of the Agreement through his solicitation or anticipated solicitation of Plaintiff's employees and clients.

134. Upon information and belief, Leo Berwick and LB AI intentionally induced Reingruber to violate Section 1.2 of the Agreement through his theft and improper retention of Plaintiff's confidential information.

135. Upon information and belief, Leo Berwick and LB AI have benefited from Reingruber's misconduct as set forth above by their retention and/or use of Cuesta's confidential information improperly misappropriated by Reingruber.

136. Leo Berwick and LB AI acted without justification or privilege in inducing Reingruber to breach his contractual obligations under the Agreement or accepting the benefits of his misconduct.

137.     As a direct and proximate result of Leo Berwick's and LB AI's intentional inducement, Cuesta has suffered and continue to suffer damage, which will continue to accrue in an amount to be proved at trial, absent preliminary and permanent injunctions.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Defendant Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq. – Against Defendants)**

138.     Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

139.     The documents stolen by Reingruber, copied onto his external hard drives and onto his iCloud account, constitute trade secrets within the meaning of the DTSA because:

   a.     Such information is not known outside Cuesta and is known within Cuesta's business only on a need-to-know basis.

   b.     Cuesta takes reasonable measures to protect the secrecy of this information. This information is highly valuable and derives its value from being secret. Cuesta expends considerable effort and expense to generate this information.

   c.     This information is very difficult – if not impossible – for others to properly acquire or duplicate without Cuesta's authorization and is not readily ascertainable.

   d.     This information would be highly valuable to Cuesta's competitors, including LB AI.

140.     Reingruber used improper means to misappropriate this information and equipment in that, *inter alia*, he downloaded materials from Cuesta's document management system to his hard drive(s) in the final days of his employment – in violation of company policy – without any legitimate business reason for doing so. He also copied these files onto his external hard drives and iCloud account. Reingruber misappropriated Cuesta's trade secrets so that he could further copy them and use them in his role at LB AI.

141.     Upon information and belief, Reingruber has used or will continue to use such information to Cuesta's detriment.

142. Upon information and belief, Leo Berwick L.P. and LB AI will use and benefit from the material that Reingruber misappropriated from Cuesta.

143. Reingruber stated plan and actual solicitation of Cuesta's clients, employees, and his employment with a direct competitor, LB AI, necessarily and inevitably involve the continued misuse and misappropriation of Cuesta's trade secrets and other confidential information to unfairly compete against Cuesta.

144. Reingruber also disclosed Cuesta's trade secrets to Leo Berwick L.P. and LB AI over the phone or other means of electronic communication, including their marketing strategy, planned sell and delivery of due diligence, pricing information including how Cuesta prices initial AI value backlog and the following execution work, cost for staffing, pricing and percentage roles. Through the above conduct, Defendants misappropriated, threaten to misappropriate, or inevitably will misappropriate Cuesta's trade secrets.

145. Leo Berwick and LB AI acquired Cuesta's trade secrets, knowing or having reason to know that they were acquired by improper means, including Reingruber's breaches of his Agreement with Cuesta and duties to Cuesta. Leo Berwick and LB AI nevertheless secretly worked with Reingruber to obtain Cuesta's employee information and then target those employees for solicitation. Through Reingruber, its agent, Leo Berwick and LB AI are now in possession of Cuesta's trade secret information concerning clients, as well. In addition, upon information and belief, Cuesta provided Leo Berwick and LB AI with Cuesta's trade secret information concerning clients, which Leo Berwick and LB AI have in their possession and control. Reingruber acquired and retain Cuesta's trade secrets, knowing or having reason to know that they were acquired by improper means.

146.    Upon information and belief, Reingruber also disclosed and used Cuesta's trade secrets, which Leo Berwick and LB AI then also used, without Cuesta's consent, to solicit Cuesta's employees. Defendants also planned to solicit Cuesta's clients, using the information Reingruber misappropriated.

147.    Defendants used improper means to acquire the trade secrets, as described above, and at the time of their disclosures and use, knew or had reason to know that the knowledge of the trade secret was derived using improper means to acquire the trade secrets. With respect to Reingruber, the trade secrets were also acquired under circumstances giving rise to a duty to maintain their secrecy, and Reingruber owed a duty to Cuesta to maintain their secrecy, set forth in his Agreement.

148.    Cuesta provided the trade secrets to Reingruber in confidence and for use exclusively in connection with the work they performed for Cuesta, for Cuesta's benefit. The above-referenced trade secret information was only available to Reingruber by virtue of his Cuesta employment. Cuesta did not authorize Reingruber to retain, use or disclose Cuesta's trade secrets after resigning from their employment with Cuesta. Cuesta did not give Reingruber permission to transfer its trade secret information to his external hard drives or iCloud. Cuesta did not authorize Reingruber to retain, or use its trade secret information, including in the solicitation of clients or employees. Cuesta did not authorize Reingruber to disclose its trade secrets to Leo Berwick and LB AI over phone calls, electronic communications, meetings or in any other manner. Cuesta did not, and would not), authorize Leo Berwick and LB AI, a direct competitor, to use Cuesta's trade secrets.

149.    Defendants can obtain economic value from the disclosure or use of Cuesta's trade secrets, for example, by avoiding the years, and millions of dollars invested, to develop the trade

secrets (including the historical client knowledge, information, client contacts, strategies, pricing schedules, and preferences, client files, and Cuesta's intellectual property embedded into its documents), and to convert Cuesta clients and employees to Leo Berwick and LB AI for their own financial gain. Such information gives Defendants an advantage by not having to expend the time and resources to develop the customer relationships or information as Cuesta has, and by allowing them to compete unfairly against Cuesta by having access to such information, such as customer history, renewal strategies, revenue information, and business opportunities.

150.    As a direct and proximate result of Defendants' conduct, Cuesta has suffered and will continue to suffer irreparable harm, injury, and losses that cannot be remedied through monetary damages. Unless enjoined, Defendants will continue to retain, use and disclose Cuesta's trade secret information to unfairly compete with Cuesta, including by continuing to target Cuesta employees and clients, and Cuesta will continue to suffer irreparable harm, including harm to Cuesta's reputation and goodwill with its clients.

151.    Under the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Reingruber also agreed in his agreement with Cuesta that breach would "result in irreparable and continuing harm" to Cuesta, and that in addition to any other remedy which Cuesta may be entitled to, Cuesta is also "entitled to injunctive relief for a breach of this Agreement."

152.    Cuesta has suffered irreparable harm as a result of such conduct, will continue to suffer irreparable harm in the absence of an injunction, and has no adequate remedy at law without an injunction.

153.    As a direct and proximate result of Reingruber's conduct, Cuesta is entitled to actual damages in an amount to be determined at trial.

154.    Reingruber has, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Cuesta and therefore should be required to pay exemplary damages to Cuesta in an amount to be determined by the Court pursuant to 18 U.S.C. § 1836.

155.    Reingruber has, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Cuesta and therefore should be required to pay attorneys' fees to Cuesta in an amount to be determined by the Court pursuant to 18 U.S.C. § 1836.

156.    If Reingruber is allowed to continue to access and use this confidential and trade secret information, it will endanger Cuesta and expose Cuesta to immediate and irreparable harm for which there is no adequate remedy at law, along with all other legal and equitable remedies available to Cuesta, including monetary damages in an amount in excess of $75,000, to be determined after discovery or at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty/Fiduciary Duty/Faithless Servant Doctrine - Against Reingruber)

157.    Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

158.    Reingruber owed a duty of loyalty and fiduciary duty to Cuesta based on its relationships of trust and confidence employing Reingruber as a Principal.

159.    As a result, Reingruber was obligated to act with the utmost good faith and in Cuesta's best interests.

160.    Cuesta relied on Reingruber's loyalty and integrity and faithful performance of his job duties and responsibilities.

161.    Reingruber breached those duties by engaging in unfaithful conduct – including but not limited to stealing Cuesta's trade secrets and other confidential and proprietary records,

30

conspiring with a competitor to launch a competing business, solicit Cuesta's clients, employees, and disclosing Cuesta's trade secrets to a Leo Berwick and LB AI.

162.    Reingruber's breaches were the proximate cause and cause in fact of Cuesta's harm.

163.    Reingruber's actions were inconsistent with his agencies of trust and his duties to act at all times with the utmost good faith and loyalty in the performance of his duties.

164.    Reingruber's disloyal activities materially and substantially permeated his service to Cuesta.

165.    Pursuant to the faithless service doctrine, Reingruber is obligated to disgorge to Cuesta all compensation that Cuesta provided to him beginning from the start of his negotiations with Leo Berwick and LB AI and his plans with them to compete unfairly with Cuesta, and Cuesta must be absolved of any further financial obligations to Reingruber.

166.    Reingruber's actions were intentional and evidence a high degree of moral turpitude and wanton dishonesty.  In breaching his duties, Reingruber acted out of malice and in bad faith, and intended to injure Cuesta.  Accordingly, an award of punitive damages is justified in an amount to be proven at trial.

167.    As a result of the aforesaid conduct of Reingruber, Cuesta has been injured, in an amount to be determined at trial, plus pre-judgment and post-judgment interest, and attorneys' fees, together with punitive damages in an amount as proof at trial may warrant.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Implied Duty of Good Faith – Against Reingruber)

168.    Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

169.    As Principal of Cuesta, Reingruber was in a position of special trust, confidence, dependency, and/or agency.

31

170.    As such, Reingruber owed a duty of good faith to Cuesta.

171.    Reingruber breached that duty by knowingly, willfully, and/or recklessly misappropriating Cuesta's confidential information, conspiring with a competitor to launch a competing business, solicit Cuesta's clients, employees, and disclosing Cuesta's trade secrets to Leo Berwick and LB AI.

172.    Reingruber's conduct was inconsistent with his agency of trust and his duty to act at all times with the utmost good faith and loyalty in the performance of his duties.

173.    Reingruber's breach was the proximate cause and cause-in-fact of Cuesta's harm.

174.    Reingruber's conduct was intentional and evinces a high degree of moral turpitude and wanton dishonesty.  In breaching his duty, Reingruber acted out of malice and in bad faith, and intended to injure Cuesta.  Accordingly, an award of punitive damages is justified in an amount to be proven at trial.

175.    As a result of Reingruber's conduct, Cuesta has been injured, for which it is entitled to recover an amount to be proven at trial, plus pre-judgment and post-judgment interest, and attorneys' fees, together with punitive damages in an amount as proof at trial may warrant.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Contract – Transaction Bonus Agreement – Against Reingruber)

176.    Cuesta repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

177.    Cuesta and Reingruber entered into the Transaction Bonus Agreement on January 30, 2025, whereby Reingruber would be entitled to a Transaction Bonus.

178.    At all relevant times, the Transaction Bonus Agreement was and is a valid and fully enforceable contract.

32

179.    The Transaction Bonus Agreement stated that payment of the Transaction Bonus was conditioned upon Reingruber's complying with the terms and provisions of the Transaction Bonus Agreement, and if Reingruber failed to satisfy the conditions precedent, he was not entitled to the Transaction Bonus.

180.    Cuesta, at all times, abided by the terms and conditions of the Transaction Bonus Agreement, and fully performed thereunder.

181.    Reingruber breached the Transaction Bonus Agreement by disclosing the Agreement and terms thereof to nonparties.

182.    Reingruber also breached the Transaction Bonus Agreement by failing to be an employee in good standing from the effective date of the agreement, January 30, 2025, through the closing of the transaction,

183.    By reason of the foregoing, Respondent breached his contractual obligations to Cuesta.

184.    As a direct and proximate cause of Respondent's breach, Cuesta has suffered and will continue to suffer damages.

185.    Accordingly, Reingruber is liable to Cuesta for breach of contract in an amount to be determined at trial, plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

      a.     damages in an amount to be determined at trial, together with Cuesta's costs and legal fees;

      b.     declaring that Cuesta is not obligated to make any post-employment payments to Reingruber;

      c.     enjoining Defendants, as well as any third party to which Defendant disclosed Plaintiff's confidential information or trade secrets from using or disclosing same;

d.      enjoining and restraining Defendant Reingruber, and any person or entity acting in concert with him, for a period of 12 months following his termination from employment with Cuesta as the Court finds appropriate based on the tolling provision of the Agreement and as extended during any period that Reingruber has breached his obligations to Cuesta, from directly or indirectly rendering to or for any Client, as defined in the Agreement, any services of the type rendered by the Cuesta;

e.      enjoining and restraining Defendant Reingruber, and any person or entity acting in concert with him, for a period of 12 months following his termination from employment with Cuesta as the Court finds appropriate based on the tolling provision of the Agreement and as extended during any period that Reingruber has breached his obligations to Cuesta, from directly or indirectly (a) soliciting any employee, consultant, officer or director of Cuesta or any of its subsidiaries for employment, consulting or other services elsewhere; (b) soliciting or interfering with any Client as defined in the Agreement, or (c) soliciting, diverting, or taking away any Client as defined in the Agreement using Cuesta's Confidential Information.

f.      ordering Defendant to submit his personal computing devices (including cellular phones), email or cloud-storage accounts, and external media storage devices in his custody, possession, or control (including any such devices or accounts used by him or his household members personally) for independent forensic inspection and remediation to purge any copies of Plaintiff's confidential information or trade secrets found thereon;

g.      Awarding Cuesta compensatory damages, in an amount to be determined at trial, plus interest;

h.      Awarding Cuesta Punitive or exemplary damages pursuant to 18 U.S. Code § 1836 and New York common law, plus interest;

i.      Awarding Cuesta reasonable attorneys' fees and costs pursuant to 18 U.S. Code § 1836;

j.      Awarding Cuesta such other and further relief, legal and equitable, that this Court deems just and proper.

Dated:  June 5, 2026
     New York, New York

**LITTLER MENDELSON, P.C.**

By: */s/ Eric A. Savage*

Eric A. Savage
Sara Elgndy
900 Third Avenue
New York, New York 10022.3298
esavage@littler.com
selgndy@littler.com
Telephone:     212.583.9600
Facsimile:     212.832.2719

*Attorneys for Plaintiff*

35