UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CUESTA PARTNERS LLC,                                    Case No.: 1:26-cv-03602(DLC)(RFT)

                        Plaintiff,

        -against-

JAMIE REINGRUBER, LEO BERWICK LP, and
LEO BERWICK AI, LP,

                        Defendants.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Cuesta Partners LLC ("Cuesta" or "Plaintiff"), submits these proposed findings of

fact and conclusions of law in connection with Cuesta's motion for a preliminary injunction.

Cuesta seeks to enjoin Defendant Jamie Reingruber ("Reingruber"), Defendant Leo Berwick L.P.

("Leo Berwick") and Defendant Leo Berwick AI, LP ("LB AI") and any entity or person acting in

concert with them, under their supervision, or on their behalf, from violating the terms of the a

Employee Confidentiality, Non-Compete and Non-Solicitation Agreement (the "Agreement"),

Reingruber signed during his employment with Cuesta, and from engaging in continued tortious

conduct.

I.      PROPOSED FINDINGS OF FACT

        A.      The Parties

                1.      Cuesta is a corporation organized and existing under the laws of the State

of Delaware, with a principal place of business in Illinois. Founded in 2019, Cuesta

operates a data, AI and IT diligence firm. Cuesta works with private equity and corporate

clients on data strategy and advanced analytics, AI strategy and execution, M&A advisory

4924-4254-5077 / 123286

and technology due diligence, technology strategy and delivery, and transformation support. (Derhake Dec. ¶ 2).

2. The company, which is based in Chicago, currently consists of 133 employees. There are 6 partners, 12 Principals, and 114 other front line and back-office employees. (*Id.*)

3. Reingruber was employed with Cuesta from 2020 until March 18, 2026, when he resigned his employment and joined LB AI (Derhake Dec. ¶¶13, 56).

4. LB AI is a limited partnership organized and existing under the laws of the State of Delaware, with a place of business in Toronto, Canada (ECF No. 43, Amended Compl., ¶12).

5. LB AI was launched with the assistance of Leo Berwick to provide services to it (ECF No. 43 ¶11). LB AI is a direct competitor with Cuesta, provides identical services and targets the same industries. (*Id.*).

6. Leo Berwick is a limited partnership organized and existing under the laws of the State of Delaware, with a principal place of business in New York. (ECF No. 43 ¶9).

**B.      Cuesta's Efforts to Protect its Confidential Business Information**

1. It is essential for Cuesta to safeguard the information in its possession. Among the types of information that it keeps inside the company are internal strategy documents, materials developed for and presented to actual and prospective clients for potential engagements, client materials to which it is given access in connection with specific transactions and deal documents, to name a few. Cuesta protects its confidential information by requiring that such information be stored and remain on Cuesta's password-

4924-4254-5077 / 123286

protected network and devices, including laptops issued to employees and the files to which employees have access Dec. (Derhake Dec. ¶ 9).

2.      In addition, Cuesta protects its confidential information, client relationships and goodwill, by requiring employees with access to confidential information to sign non-solicitation agreements and confidentiality agreements. (Derhake Dec. ¶ 10).

3.      Submission of final deliverables to external individuals is recommended to be submitted through PDF form. These formulas and templates have been built from a blank slate to set up, design, test and implement this consulting methodology, intellectual property and know-how so we can deliver value to our clients.  It is the product of thousands of hours of work by highly skilled employees and significant investment by the company to develop our methodology and value proposition to clients. They were meticulously designed as Cuesta's work product to streamline and effectively produce key work product for Cuesta clients and for business development purposes. (Derhake Dec. ¶ 11).

4.      Cuesta takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure. At all relevant times, Cuesta has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information, including:

        a. requiring that all employees agree to confidentiality and non-disclosure provisions, such as those in Reingruber's Agreement.

b. maintaining customer and personnel information on password-protected computer systems accessible only by employees of Plaintiff or its affiliates.

c. Requiring that all client files be stored on Microsoft SharePoint and not locally.

d. Maintaining Microsoft Intune on all company laptops enabling the company to lock laptops remotely.

e. Providing access to client, personnel, and sales data on an individual need-to-know basis.

f. Transmitting PDF files to non-Cuesta employees, including clients, preserve key formulas and IP embedded in native files. (Derhake Dec. ¶ 12).

## C.    Reingruber's Employment With Cuesta

1. Jamie Reingruber was Cuesta's first hire.  He began his employment with Cuesta in 2020 as a Senior Associate. (Derhake Dec. ¶ 13). He received a promotion to manager in July 2021, and was promoted to senior manager in January 2023. (*Id*.). Finally, Reingruber was promoted to Principal in July 2024. (*Id*.). He also became the Co-lead of Technology Strategy Practice. (*Id*.).

2. As Principal, Reingruber was responsible for the full cycle of projects up through and including closing and delivery. (Derhake Dec. ¶ 14).  As Co-Lead of the Technology Strategy Practice, he was responsible for defining the practice's strategy,

which included the go-to-market approach, delivery methodology, asset investment plans, and human capital needs and tactics. (*Id.*).

3.      Reingruber had project teams under him and was responsible for managing client relationships and ensuring client retention by evaluating client risks and developing solutions to address client needs. (Derhake Dec. ¶ 14). He served as a client contact for day-to-day client needs and client questions. (*Id.*). In doing so, he relied on financial and internal resources from Cuesta to manage client relationships. (*Id.*). Reingruber was successful in developing client relationships by virtue of his employment and assisted by an experienced team of Cuesta employees. (*Id.*).

**D.      Reingruber's Employee Confidentiality, Non-Compete and Non-Solicitation Agreement with Cuesta**

1.      Effective August 6, 2021, Reingruber signed a Employee Confidentiality, Non-Compete and Non-Solicitation Agreement (the "Agreement"), which provided him with economic benefits in exchange for certain post-employment obligations. (Derhake Dec. ¶ 24; Exhibit 1).

2.      By signing the Agreement, Reingruber acknowledged that he was is in a position of confidence and trust, and would be exposed to, confidential and proprietary information. (Derhake Dec. ¶ 25; Exhibit 1 § 1.1).

3.      Reingruber also acknowledged that Cuesta's Confidential Information as defined under the Agreement is the sole and exclusive, valuable property of Cuesta, and the confidential and secret character of the Confidential Information, that such Confidential Information is extremely valuable and that it gives Cuesta a competitive advantage over those who do not know the information. (Derhake Dec. ¶ 26; Exhibit 1 § 1.2).

4.     Thus, Reingruber agreed that while employed by Cuesta and for so long thereafter as the information remained confidential, he would not use, disseminate, or disclose Cuesta confidential information to any other person, organization, or entity, except in the performance of his job or as authorized by Cuesta. (Derhake Dec. ¶ 27; Exhibit 1 § 1.2).

5.     By electronically signing the Agreement, Reingruber agreed that he would not use for his own or another's purposes, or disclose to any other person or entity (other than in the proper course of his employment with Cuesta) any of Cuesta's confidential information. (Derhake Dec. ¶ 28; Exhibit 1 § 1.2).

6.     By signing the Agreement, Reingruber acknowledged that his breach of these obligations would cause irreparable injury to Cuesta for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the confidentiality obligations Cuesta would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond. (Derhake Dec. ¶ 29; Exhibit 1 § 7).

7.     Reingruber agreed that upon his termination from employment he would return all documents and files containing Cuesta's confidential information, and all Cuesta property, including the laptop provided to him. (Derhake Dec. ¶ 30; Exhibit 1 §§ 1.2, 8).

8.     Reingruber agreed that for six months following his separation from employment with Cuesta he would not: (a) disrupt, damage, impair or interfere with the business of the Company by soliciting any employee, consultant, officer or director of the Company or any of its subsidiaries for employment, consulting or other services elsewhere;

(b) disrupt, damage, impair or interfere with the business of the Company by soliciting or interfering with any Client, or (c) solicit, divert, or take away any Client using Confidential Information. (Derhake Dec. ¶ 31; Exhibit 1 § 6).

9.    He also agreed for a period of six months (6) months following termination of his or her employment from the Company, Employee will not, whether personally or through others, directly or indirectly, acting as an employee, contractor, consultant, partner, shareholder or otherwise, render to or for any Client any services of the type rendered by the Company. (Derhake Dec. ¶ 31; Exhibit 1 § 5).

10.    By signing the Agreement, Cuesta acknowledged that his breach of these non-solicitation obligations would result in irreparable injury to Cuesta for which monetary damages would not be readily calculable and an adequate remedy at law would not be available. He, therefore, agreed that in the event of his breach of the non-solicitation obligations, Cuesta would be entitled to, among other damages, specific performance and temporary and permanent injunctive relief, to prevent his further breach, without the need to post a bond.  (Derhake Dec. ¶ 32; Exhibit 1 § 7).

11.    On May 10, 2023, Reingruber acknowledged receipt of the Cuesta Partners Employee Handbook 2023 (the "Handbook") and agreed that "it is my responsibility to read and comply with the policies contained in this document".  (Derhake Dec. ¶ 33; Exhibit 2).

12.    Section 9.1 of the Handbook provides that "[E]mployees are required to protect the confidentiality of Company trade secrets, proprietary information, and confidential commercially- sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents

4924-4254-5077 / 123286

trademarks, etc.) related to the Company.  Access to this information should be limited to a 'need to know' basis and should not be used for personal benefit, disclosed or released without prior authorization from management." (Derhake Dec. ¶ 34; Exhibit 2).

13.     In exchange for his agreement to the terms of employment, and his promises in his various agreements, Cuesta was well compensated. (Derhake Dec. ¶ 35).  His base salary for 2025 was $225,000 and he received a bonus for the year of $64,174. (*Id*.).

### E.     Leo Berwick and LB AI Structure and Recruitment of Reingruber

1.     In approximately September 2025, Cuesta was approached by Nick Kato, the Chief Operating Officer of Leo Berwick LP ("LB") about a possible acquisition of Cuesta.  (Derhake Dec. ¶ 36).  After one or two calls and a meeting, Mr. Kato was directed to have all further communications on the subject with our banker, Canaccord Genuit. (*Id*.). There came a point when Mr. Kato's communications with Cuesta's banker ended and the proposed transaction went no further. (*Id*.).

2.     Cuesta chose not to proceed with the transaction and ultimately went forward with the acquisition by Riveron. (Derhake Dec. ¶¶ 4, 36).

3.     In 2025, LB AI was formed under the direct of Kato and Leo Berwick, under the name Tenen Point LP, to launch a competing business offering the same or similar services as Cuesta. (Compl. ¶50-54;  Derhake Dec. ¶¶ 4, 36, 40; Exhibit 3).

4.     Leo Berwick and what would become LB AI began recruiting Reingruber in or around December 2025. (Derhake Dec. ¶¶ 39; Exhibit 3).

5.     Mr. Kato, together with other representatives of Leo Berwick and/or LB AI, and Reingruber discussed Leo Berwick's plans to launch a competing business with

Cuesta. Kato informed Reingruber that Leo Berwick and LB AI targeted him as a recruit. Kato stated that "when we found your profile, what we liked about it was, you're in the you know, you you know, obviously, are in New York. You seem like you're like, part of the private equity team doing a lot of, doing a lot of that type of work, you know, the diligence and the kind of implementation post close, and that's a space that we're very interested in." (*Id.*).

6. Kato further stated to Reingruber that after his unsuccessful discussions about a transaction with Cuesta or an acquisition of the company, he developed a plan to hire away its key people and develop a competing business. Katos stated to Reingruber:

> I was like, and then, and then, when you look at, like, the number of principals at your level that are around, and like, who's doing what? Like, they kind of did some work. And were like, it seems like you this guy, like, running Columbia is important, you know, and maybe like four other people kind of important. Seemed like, there's like six people that are, like, really important, you know, at Cuesta that don't have equity. And we're like, this seems like a great opportunity to go to these people. Give them large shining bonuses, give them nice guarantees, yeah, have a bunch of capital to go and start the business and make it a thing and then give everyone equity in the business, you know? And so that's what kind of prompted it.

(Derhake Dec. ¶¶40; Exhibit 3).

7. During a subsequent phone call with Kato, Omar Khalifa, the Chief Executive Officer of LB AI, and Reingruber, Kato and Khalifa discussed their plans to lure away Cuesta's employees and clients and induce Reingruber to do so. Kato or Khalifa stated to Reingruber:

> So, yeah, Jamie, something that we, obviously, we could talk about in a future discussion, if we can get you on board with this, it'd be critical for you to help us identify other members of your team that need to come along and be part of this. Because, in my mind, this works if there's like, 565[sic] to 10 people that are, you know, that core to be lifted out….

4924-4254-5077 / 123286

(Derhake Dec. ¶ 41; Exhibit 4).

8.      Over the next several months, Kato, Khalifa and Reingruber had several phone calls with Reingruber in furtherance of their plan to launch a competing business and induce Reingruber's breach of his Agreement with Cuesta. In one meeting, while still employed with Cuesta, Reingruber specified and disclosed to Defendants Cuesta's go-to-market strategy around how Cuesta sells and delivers due diligence. (Derhake Dec. ¶ 42; Exhibit 5).

9.      Reingruber disclosed to Khalifa and Kato Cuesta's staffing model and strategy for due diligence and data work, laying out the details of Cuesta's go-to-market strategy, developed methods for pricing, including Cuesta's formula for pricing an initial AI value backlog and bet on the following execution work. Kato and Khalifa engaged in a series of questions with Reingruber, wherein he disclosed staffing, percentage roles, and pricing. He walked them through several of Cuesta's ongoing projects, relaying key information as to pricing and delivery strategies that would help LB AI accelerate its business. (Derhake Dec. ¶ 43; Exhibits 5 and 6).

10.      Kato and Reingruber detailed their plans to solicit Colum Elliot-Kelly, Cuesta's Principal, Reingruber advising Kato that: "he's built, like, tons of AI products, and so, like, he's critical for a lot of the solutioning in the back end." (Derhake Dec. ¶ 44; Exhibit 3).

11.      Reingruber executed a restrictive covenant agreement with Leo Berwick and LB AI on February 12, 2026.

12.    On February 25, 2026, Reingruber emailed Khalifa and Peter Robinson, Special Advisor, Integration & Separation at LB AI, setting forth details as to LB AI's planned marketing strategy and client pitches. (Derhake Dec. ¶ 46; Exhibit 8). Reingruber wrote:

> I'm already seeing this firsthand: 100% of the warm intros we've had from our buyer to other PE clients thus far have been prompted by a request from an MD to "talk about AI." PE investment and operating teams are rushing to weave AI into their investment and value creation strategies. This presents a unique opportunity to pitch our services while providing genuinely helpful advice, particularly around which specific AI use cases we've seen be most effective for companies that resemble their portfolio companies. Discussions on how to approach triaging and executing these initiatives across the portfolio also always seem to drive an unusually high level of engagement. (*Id*.).

13.    In a follow-up email on February 27, 2026, Reingruber stated he looked "forward to connecting tomorrow," with additional suggestions to LB AI's business plan, suggesting that they establish a Customer Advisory Board in order to create "a strong opportunity to bring in a few trusted relationships who can provide ongoing feedback while becoming genuinely invested in our success. I think forming both a PE-focused CAB and an industry-specific CAB would make a lot of sense." (*Id*.).

14.    On February 28, 2026, Reingruber wrote to Robinson and Khalifa: "[t]o be confirmed Monday, but it looks like I'll receive my Transaction Bonus March 13 or 20, after which I'll schedule some time with Cuesta leadership to discuss my exit… We didn't directly discuss this but it would also be helpful if there were broader language providing legal protection against potential litigation from Cuesta under my agreement. For example, if they were to allege a non-solicitation breach in connection with someone

independently choosing to join, I would want confirmation that my legal defense would be covered." (*Id*.).

15. Khalifa responded, "all the blow [sic] sounds good and will chat with lawyers and revert back." (*Id*.).

16. In early March 2026, Reingruber prepared a "Leo Berwick IT Advisory year 1 Business Development Plan" dated March 2026, wherein he explicitly stated that he would target private equity funds not yet Leo Berwick clients, through Reingruber's existing "PE network built across Cuesta Partners, Riveron, and prior advisory work. Key targets include funds with active deal pipelines where IT risk is a known concern." (Derhake Dec. ¶ 51; Exhibit 9).

17. Reingruber developed pitch decks for Leo Berwick and LB AI as early as March 5, 2026, setting forth plans to target "private equity clients" – the very clients that Cuesta serviced or sought to service. (Derhake Dec. ¶ 52; Exhibit 10).

18. In furtherance of this goal, Reingruber created a LinkedIn Connection Analysis, listing "potential clients – PE Firms, Capital Providers & Adjacent" which specifically included Cuesta's clients. On the document, he even noted "pass to LB!" next to one individual. The excel file also included a sheet entitled "Contractors & Industry SMEs – Tenon Point AI & Data Practice" which listed Cuesta's current contractors, and one that Leo Berwick AI actually hired while working for Cuesta. (Derhake Dec. ¶ 53; Exhibit 11).

19. On March 6, 2026, Leo Berwick and LB AI submitted a final offer package to Reingruber. (Derhake Dec. ¶ 54; Exhibit 12). Included in his proposed employment

contract with LB AI was an explicit provision to incentivize Reingruber to solicit employees to Cuesta. Reingruber's employment agreement with LB AI contained a special bonus provision under which Reingruber would be compensated with bonuses for the hiring of individuals with the following titles: (i) Offshore leader: $125,000; (ii) AI SME (subject-matter expert) $125,000; (iii) Associate $40,000; (iv) Consultant $50,000; and (v) Manager $60,000. (*Id*.).

20.    Reingruber's employment contract with Leo Berwick AI also contained an indemnity provision including all claims, costs expenses, including reasonable attorneys' fees arising out of relating to any actual or threatened claim by Cuesta against Reingruber "based upon or arising from [Reingruber's] contacting, soliciting, communicating with, providing services to (a) employees or former employees of [Cuesta], and (b) clients or former clients of [Cuesta] with whom [Reingruber] had a pre-existing professional relationship or whom [Reingruber] personally serviced during his employment with [Cuesta]." (Derhake Dec. ¶ 55; Exhibit 12).

## F.    Reingruber's Abrupt Resignation from Cuesta

1.    On March 13, 2026, Reingruber disclosed to Thomas Derhake that he was thinking of leaving Cuesta. (Derhake Dec. ¶ 56).  On March 17, 2026 he told Derhake that he was thinking of joining Leo Berwick and on March 18, 2026, Reingruber announced his resignation from Cuesta by email (Derhake Dec. ¶ 56; Exhibit 13).

2.    On March 19, Cuesta provided Reingruber with a prepaid FedEx label with directions to return his Company laptop. (Derhake Dec. ¶ 57).

3.    Reingruber did not return the laptop until ordered to do so by this Court. (Derhake Dec. ¶ 56).

4924-4254-5077 / 123286

**G.    Cuesta Discovers that Reingruber was Breaching His Non-Solicitation and Confidentiality Agreements**

1.    Just one day after receiving his final agreement, Reingruber downloaded slightly more than 34,500 files, a level of activity which was completely inconsistent with his legitimate job needs. (Derhake Dec. ¶¶ 58, 66-68; Exhibit 14).

2.    Cuesta only recognized this activity on March 19, 2026, after receiving Reingruber's resignation (Derhake Dec. ¶ 57). Cuesta accordingly performed a remote lock on the Company laptop. (*Id*.).

3.    The spreadsheet compiled by Cuesta's Information Technology Group demonstrates that Reingruber began downloading a huge number of Cuesta's files comprised of confidential information and trade secrets (Derhake Dec. ¶¶ 59-65; Exhibit 14). In total, between March 2 and March 19, 2026, he downloaded approximately 40,562 files. (*Id*.).

4.    By contrast, he had downloaded approximately 1,312 files in total between November 6, 2025 and February 24, 2026.  (Derhake Dec. ¶ 59).

5.    Reingruber downloaded this materials onto his laptop, and to an external hard drive, both of which were sent by Reingruber to Cuesta's third party forensic examiner, iDS, following the Court's issuance of the TRO. (Derhake Dec. ¶ 60).

6.    The materials that Reingruber downloaded included, among other things, clients' financial statements, bank statements, payroll registers, tax returns, employment agreements, incentive and commission plans, employee reviews, video recordings, non-compete and non-disclosure agreements and corporation formation documents.  Much of

4924-4254-5077 / 123286

this material was provided to Cuesta by its clients in connection with specific projects including due diligence matters, evidencing that Reingruber's downloading constituted a generalized "sweep" of files and records. (Derhake Dec. ¶ 61).

7.      In addition, the documents contained native file templates for Cuesta's deliverables, with embedded formulas that Cuesta developed over several years. This data is especially valuable as it provides a short cut to outputs in work product. Some examples of these include (1) a native power point document entitled "Data Platform MDM Timesavers," that is comprised of over 75 slides of example roadmaps, business cases views, ways to document Cuesta's recommendations and proposals, which allows Cuesta to save substantial time and money, and deliver consistent, high quality deliverables and leverage junior employees to compete work from the document templates rather than senior level executives repeatedly building projects from scratch for each and every client; (2) a Meyers AI Value Backlog document, that is an actual client deliverable, containing all of the AI value backlog details, setting forth Cuesta's methodology as to the resolution of backlog work, pricing estimates for Cuesta to complete its work, and its plans to build an AI strategy at an organization; and (3) Form Factor documents. (Derhake Dec. ¶ 62).

8.      The files also included documents created by Cuesta, such as client relationship maps detailing each client's leadership and decision makers, with planned strategies for securing contracts and pricing schedules. (Derhake Dec. ¶ 63).

9.      The due diligence files and privileged client information provide insight into customers' individual price tolerance. (Derhake Dec. ¶ 64).

10.      The nature of the files downloaded by Reingruber far exceeded any conceivable nexus to his daily responsibilities and work duties. (Derhake Dec. ¶ 65).  The

4924-4254-5077 / 123286

downloads comprised complete client files which include client due diligence files and Cuesta's work product generated for the respective clients. (*Id.*).  Examples would be client relationship maps, developed by Cuesta, with key information on each client's leadership and planned strategy and deliverables, sales strategies, and native files with Cuesta's IP to streamline work demands. (*Id.*). The downloads also include hundreds of power business intelligence dashboards. (*Id.*). In any event, the tasks associated with these files would be delegated and worked on by Reingruber's reports. (*Id.*).

11.    Moreover, many of the downloads appear to include work for clients for which Reingruber either never worked or for which he was not involved in any matters at the time of his departures. (Derhake Dec. ¶ 66).  The client files include materials that clients entrusted to Cuesta with expectations of privacy and confidentiality and include, among other things, employment agreements, compensation agreements, non-compete and non-disclosure agreements, financial statements, general ledger documents, payroll register, earnings reports, tax returns, employee reviews, customer and vendor contracts, corporate formation documents, insurance policies, and benefit documents, among other things.  (*Id.*).

12.    Many of the downloads appear to include completed projects for which there was no current activity. (Derhake Dec. ¶ 67). He downloaded materials that Cuesta received from clients – who had legitimate expectations of privacy and confidentiality for their data - for which he never performed any work and from others for which he was not involved in any projects at the time of his departure. (*Id.*).

13.     There is no legitimate business reason for Reingruber to have downloaded complete client files, let alone the volume of files he downloaded, particularly since he was on the point of leaving Cuesta.  (Derhake Dec. ¶ 68). The fact that Reingruber did so shortly before announcing his resignation creates grave doubt that he had any Cuesta-related reason for this level of activity, particularly on a weekend. (*Id*.).

**H.     Defendants' Solicitation of Cuesta's Employees and Contractors**

1.     Some of Cuesta's employees, including at least one Principal that Reingruber, Kato and Khalifa specifically discussed recruiting, was solicited by Leo Berwick or LB AI.  (Derhake Dec. ¶¶ 38, 44, 70; Exhibit 3). On April 28, 2026, Leo Berwick AI's newly-launched website revealed that another senior data resource named Danielle Dangoia-Crandall, who had been supporting Cuesta over the past several months, had appeared on Leo Berwick AI's employee list as a Data and Integration Specialist. (Derhake Dec. ¶¶ 53, 70; Exhibit 17). This very person appeared on Reingruber's list of personnel to recruit to LB AI that he had prepared in March 2026 while still working for Cuesta (Derhake Dec. ¶¶ 53, 70; Exhibit 11).

2.     Since leaving Cuesta, Reingruber has reached out to Leonard Kang, a Cuesta Senior Manager, to ask how Cuesta built its data practice and how his new company should hire data engineers (Derhake Dec. ¶71).

3.     A group lift-out would leave Cuesta understaffed and threaten its business through a major territorial market. (Derhake Dec. ¶71).

**I.     Cuesta's Efforts to Abate Reingruber's Breaches and Leo Berwick and LB AI's Inducement and Encouragement thereof Prior to Commencing this Action**

1.      On March 24, 2026, counsel for Cuesta sent Reingruber and Leo Berwick a letter placing it on notice of the terms of Reingruber's Agreement, asking that Reingruber comply with his obligations thereunder, and that Leo Berwick and LB AI not tortiously interfere with Cuesta's contractual rights (ECF No. 9 ¶5; ECF No. 43 ¶100). Cuesta also requested assurances related to Reingruber's downloading of Cuesta's confidential information and solicitation of employees to Leo Berwick or LB AI. (*Id.*).

2.      On March 24, 2026, counsel for Leo Berwick responded by letter to Cuesta's counsel, advising that Reingruber was planned to start at LB AI, an entity which provides services to Leo Berwick, falsely claiming that Reingruber's new position does not overlap with the nature of work that Cuesta does (ECF No. 43 ¶101). More importantly, Leo Berwick did not address the assurances Cuesta sought (*Id.*). Notably, Leo Berwick did not deny that Reingruber solicited Cuesta's employees to Leo Berwick and LB AI, disclosed and transmitted Cuesta's confidential information to them, or that they had an involvement in inducing him to do so. (*Id.*).

3.      The stolen data regarding Cuesta could be used for the benefit of Leo Berwick and LB AI- and to Cuesta's detriment - regardless which entity actually employs Reingruber. (*Id.*).

4.      On March 25, 2026, counsel for Reingruber responded by letter to Cuesta's counsel, in part, denying enforceability of Reingruber's Agreement, but did not contest the non-solicitation, confidentiality obligations, nor the return of property provision. (ECF No. 43 ¶103).

5.      In acknowledging Reingruber's downloading Cuesta's confidential files in the days leading to his employment, Reingruber's counsel asserted that "there was nothing

nefarious about an employee downloading files he needs to perform his job." (ECF No. 43 ¶104). Reingruber was silent on whether the confidential information he improperly downloaded was disseminated to Leo Berwick or LB AI. (*Id*.).

6.     Additionally, counsel stated that Reingruber is "willing" to return the Company laptop only *after* the laptop was unlocked and Reingruber able to remove his personal information. (ECF No. 43 ¶105).

7.     On April 4, 2026, counsel responded to Defendants and restated their prior assurances related to Reingruber and Leo Berwick. (ECF No. 43 ¶106). Cuesta again requested that Reingruber's Company laptop be returned as required by his contract and advised that it would work in conjunction with Reingruber to ensure all of his personal files were removed from the Company laptop upon receipt (*Id*.). Reingruber refused to return the Company laptop. (ECF No. 43 ¶106; Derhake Dec. ¶ 56).

8.     Plaintiff then commenced this action on April 30, 2026, and obtained a Temporary Restraining Order (*see* Docket No. 19) (the "TRO").

## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Jurisdiction and Venue

1.     The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1337.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant Reingruber resides in this District.

### B.     Cuesta is Entitled to a Preliminary Injunction

1.      "In the Second Circuit, a plaintiff seeking a preliminary injunction must establish: '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 922 F. Supp. 2d 435, 439 (S.D.N.Y. 2013), *aff'd,* 764 F.3d 210 (2d Cir. 2014) (*citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010)).

2.      Cuesta has established that it will suffer irreparable harm absent injunctive relief.  "To establish irreparable harm, a plaintiff must establish both that an injury is likely absent the injunction and that the injury cannot be adequately remedied with money damages*." IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011).

3.      Specifically, as set forth above, the underlying record, even without the benefit of any discovery, proves that Reingruber:

  a. met with LB repeatedly over a period of months while still employed with Cuesta and downloaded confidential Cuesta documents onto his iCloud and recently purchased hard drives during the same period;

  b. Overtly discussed lifting out Cuesta's principals and other employees and contractors to compete with Cuesta;

  c. Plotted to solicit Cuesta clients, developed through his employment with Cuesta; and

  d. actually persuaded at least one Cuesta contractor, to perform services for LB AI.

4.       Moreover, Leo Berwick explicitly touted their intent to lure Cuesta's high level employees to LB AI with compensation packages and to utilize their connections to solicit Cuesta's clients and compete directly with them.

5.       Despite being reminded of his contractual obligations, Reingruber refused to return his Company laptop without a Court order and remains in possession of Cuesta's confidential information by virtue of various devices and his iCloud account.

6.       Defendants' misconduct, which has persisted even after express notice from Cuesta informing them of their breaches and their continuing obligations, demonstrates that injunctive relief is warranted. Reingruber's violations of his Agreement "threaten to cause [Cuesta] irreparable harm by luring away the business of a number of long-term [Cuesta] clients." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004).

7.       Further, it is well-settled that the loss of "future sales, goodwill and entire client accounts" cannot be easily quantified in monetary terms. *Uni-World Capital, L.P. v. Preferred Fragrance*, Inc., 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (noting that the loss of client relationships and good will can only be remedied by monetary damages in unusual circumstances); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"); *Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195 (JGK), 2008 WL 47788239, *14 (Oct. 31, 2008) ("The total monetary value of Marsh's loss of client[s] would be very difficult, if not impossible, to calculate with any exactitude.  Nor could the lost goodwill that Marsh has built with these clients be easily quantified and compensated.").

8.      These losses, and the accompanying loss of goodwill with the concerned customers, cannot be adequately compensated by monetary damages. *See e.g., Uni-World Capital,* 73 F. Supp. 3d at 236.

9.      Further, Reingruber's signed Agreement with Cuesta provides that his breaches have irreparably harmed Cuesta and entitle it to injunctive relief. Specifically, in the Agreement, Reingruber expressly acknowledged that "irreparable injury will be suffered by the Company should Employee breach any of those provisions." In the Second Circuit, such contractual provisions support a finding of irreparable harm. See, e.g., *N. Atl. Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm and relying, in part, on the former employee's acknowledgement that a breach of his agreement would cause "irreparable injury" to the employer); *Devos, Ltd. v. Record*, No. 15-CV-6916(ADS)(AYS), 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (finding irreparable harm where the restrictive covenant agreement stated that a breach would result in irreparable injury, that damages would be unascertainable in monetary terms, and that the plaintiff would have no adequate remedy at law); *Uni-World Capital*, 73 F. Supp. 3d at 236-37 (citing provision that any breach of the non-compete agreement "may result in irreparable harm and continuing damages to the Employer and its business and that the Employer's remedy at law for any such breach or anticipated or threatened breach will be inadequate").

**C.      Cuesta is Likely to Succeed on the Merits of its Claims**

1.      Based on the evidence to date, Cuesta is likely to succeed on the merits of its claims against Defendants, or at the very least Cuesta can demonstrate a sufficiently serious question going to the merits on each of its claims.

### (i) Breach of Contract (Claim I and IV)

2. To prevail on its breach of contract claims, Cuesta must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages or injury resulting from the breach. *Carlson v. Rehab. Inst. of Chi.*, 50 N.E.3d 1250, 1255 (Ill. App. Ct. 1st Dist. 2016).

3. Cuesta has shown that it entered into an agreement with Reingruber (the Employee Confidentiality, Non-Competition, and Non-Solicitation Agreement), and that it adequately performed under each agreement by employing Reingruber and paying him compensation in connection with his work. Cuesta also established that Reingruber took and kept its confidential information, refused to return its property, used Cuesta's confidential information in connection with the hiring of one of Cuesta's contractors, in breach of his agreements with Cuesta, and that Cuesta suffered damages stemming directly from Reingruber's breaches.

4. Similarly, Plaintiff established a likelihood of success on it's Sixth Cause of Action for Breach of the Transaction Bonus Agreement. First, the Transaction Bonus Agreement is a valid and enforceable contract. Second, Cuesta adequately performed under the Transaction Bonus Agreement by remitting the first installment of the Trasactio Bonus to Reingruber. Reingruber breached the agreement by (1) disclosing the Transaction Bonus and terms of the Agreement to third parties; and (2) failing to be an employee in good standing from the effective date of the January 30, 2025, through the closing of the transaction. Cuesta suffered damages stemming directly from Reingruber's breaches.

### (i) Tortious Interference Claims (Claim II)

5.      "To state a claim for tortious interference with contract under New York law, Mercer must demonstrate: (1) the existence of valid contracts between Mercer and the Individual Defendants, (2) LB AI's and Leo Berwick's knowledge of those contracts, (3) Lockton's procurement of the Individual Defendants' breaches of those contracts, and (4) damages. *Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 276 (E.D.N.Y. 2014). Each of these elements is met here with respect to Plaintiff's Breach of Agreement claim. First, as demonstrated above, the Individual Reingruber's Agreements is a valid and enforceable contract. Second, Leo Berwick and LB AI anticipated the existence of the contracts during its recruitment of the Reingruber, and negotiated indemnity for Reingruber regarding his obligations before he had even left Cuesta.  Third, notwithstanding its knowledge of the Agreement, Cuesta permit the Reingruber to solicit information regarding Cuesta's hiring of contractors to obtain a contractor to procure employment with LB AI.  The Defendants also detailed their plans for further recruitment of Cuesta's principals with Reingruber's assistance, and for their plans to poach Cuesta's clients. Cuesta is likely to succeed on this claim.

### (i)      Defend Trade Secrets Act

6.      The DTSA provides a federal cause of action to the owner of a trade secret that is misappropriated and is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836(b). A trade secret is defined to include "all forms and types of . . . business . . . information, including . . . compilations," provided that: (A) the owner has taken "reasonable measures to keep such information secret"; and (B) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3).

7.     By virtue of his position with Cuesta, Reingruber was privy to Cuesta's trade secrets and confidential customer information, including but not limited to its current and historical client account information, including client needs and preferences, confidential information, due diligence files, leadership and experiences; financial information, such as client pricing information and revenue received per client, and compilations of them; Cuesta's business development plans, products, strategies, revenue projections, financial planning, and accounts receivable information; the terms of Cuesta's agreements and financial arrangements with its clients; Cuesta's internal operating, management, selling, marketing, and administrative materials; Cuesta's sales, marketing, and business strategies; and the native files and template documents containing Cuesta's intellectual property, formulas and algorithms developed by Cuesta.

8.     Cuesta has devoted substantial effort over the course of several years to build and develop its trade secrets, which are not readily ascertainable through public sources and its secrecy provides independent economic value to Cuesta.

9.     Cuesta has taken reasonable measures to keep this information secret through restrictions on access and the use of nondisclosure agreements. *See, e.g., Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 2016 U.S. Dist. LEXIS 130918, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (finding that confidentiality agreements and access restrictions supported a claim under the DTSA).

10.     Cuesta is likely to succeed in showing that Reingruber misappropriated Cuesta's trade secrets. The DTSA defines misappropriation to include "disclosure or use

4924-4254-5077 / 123286

of a trade secret of another without express or implied consent by a person who . . . acquired [the trade secret] under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II).

11.    Reingruber obtained access to Cuesta's trade secrets through his employment and signed a non-disclosure agreement affirming his obligations to keep the information in confidence, refrain from disclosing the information to third parties, and return the information to Cuesta at the conclusion of his employment. Because Reingruber impermissibly downloaded these files onto his external hard drives, iCloud account, and verbally disclosed them to Leo Berwick and LB AI, Cuesta is also likely to succeed in showing that Reingruber breached his duties of confidentiality by his unauthorized use of Cuesta's trade secrets.

12.    For these reasons, Cuesta is also likely to succeed on its claim against Leo Berwick and LB AI. *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15CV211LGSRLE, 2016 U.S. Dist. LEXIS 130918, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (quoting 18 U.S.C. § 1839(3) (A)-(B)). (A DTSA claim lies where at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty").

13.    Moreover, under the Defend Trade Secrets Act ("DTSA"), a court may grant an injunction to prevent any "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

**(i)    Breach of Fiduciary Duties (Claim IV) and Breach of Implied Covenant of Good Faith and Fair Dealing (Claim V)**

14.     Employees owe their employers a fiduciary duty of loyalty, including a duty to not use or disclose the employer's confidential information for the purpose of competing with the employer. *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec. 12, 2011).

15.     Similarly, employees breach their duty of loyalty when they take deliberate steps, while employed, to leave their employer understaffed. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 522 (S.D.N.Y. 2011) (entering judgment against defendants for breach of duty of loyalty).

16.     Reingruber owed Cuesta a fiduciary duty of loyalty not to disclose Cuesta's confidential information for the purpose of competing with Cuesta and to not solicit its employees.   Reingruber breached those duties. Based on these facts, Cuesta has a likelihood of success on the merits of its breach of fiduciary duty claim.

**D.      Cuesta has demonstrated a likelihood of success on the merits for each of its claims.  In addition, a balance of the equities tips in favor of Cuesta.**

1.      Cuesta seeks to maintain the status quo and prevent Defendants from breaching contractual obligations, breaching their fiduciary duties and engaging in tortious business practices. Reingruber's contractual obligations are reasonable and narrowly tailored. The Agreement does not prevent the Reingruber form working for Cuesta or developing business based on their current employment and resources. Nor do the Agreements prevent LB AI from engaging in fair competition with Cuesta.

2.      On the other hand, if immediate equitable relief is not granted, Defendants will be able to continue to unfairly compete with Cuesta using Cuesta's confidential information and undermining the investment of substantial time, resources and goodwill that Cuesta made in its client relationships, employee and contractor relationships, and development of its confidential information and trade secrets. Therefore, the balance of the equities decidedly weighs in favor of Cuesta. *See Schuhriemen,* 183 F. Supp. 3d at 536–37 (granting preliminary injunctive relief and observing with respect to the "to the balance of equities," that the individual defendant was unlikely to suffer "great hardship" if he was prevented for one year from soliciting" the plaintiffs' clients, and further observing that plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

**E.      Cuesta Should be Awarded its Costs and Attorneys' Fees Incurred in Seeking Injunctive Relief.**

1.      Cuesta seeks an award of the attorneys' fees and costs that it has occurred in bringing this motion for injunctive relief under Reingruber's Agreement.   The Agreements entitles Cuesta not only to specific performance, temporary and permanent injunctive relief, but also to "recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

2.      Where, as here, the "intention to provide counsel fees as damages for a breach of contract . . . is unmistakably clear from the language of the contract," New York courts will effectuate that intention.  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,*  418 F.3d 168, 177 (2d Cir. 2005); *Karasaki*, 2008 WL 4778239, at *21

("Therefore, Marsh is entitled to reasonable attorneys' fees and costs that it has incurred in bringing this motion.").

Dated: June 17, 2026
      New York, New York

**LITTLER MENDELSON, P.C.**

By: */s/ Eric A. Savage*
    Eric A. Savage
    Sara Elgndy
    900 Third Avenue
    New York, New York 10022.3298
    esavage@littler.com
    selgndy@littler.com
    Telephone:    212.583.9600
    Facsimile:    212.832.2719

    *Attorneys for Plaintiff*

4924-4254-5077 / 123286